G. W. HONEY, TREASURER, v. B. CLARK AND OTHERS.

1. From 1828 until the Texan Declaration of Independence, it seems there was no law in Texas prohibiting marriage between whites and negroes.
2. This court is unable to perceive why the same facts which would authorize a jury to presume a marriage at common law should not also war-

rant the presumption of a marriage under the laws in force in Texas prior to her Revolution. Wherefore *held*, that evidence of cohabitation between a white man and a negress, in Texas, during and subsequent to the year 1833, was competent evidence of a marriage between them.

3. The Constitution of 1869, Article 12, Section 27, provides : " All persons " who, at any time heretofore, lived together as husband and wife, and " both of whom, by the law of bondage, were precluded from the rites " of matrimony, and continued to live together until the death of one of " the parties, shall be considered as having been legally married; and " the issue of such cohabitation shall be deemed legitimate." *Held*, that this provision legitimated the children of a white man by a negress with whom he cohabited in Texas from 1833 until his death in 1862. *Held further*, inasmuch as no escheat of the decedent's property had ever been consummated, that such children were entitled to recover the property from the State Treasurer, into whose custody the administrators had delivered it.

APPEAL from Wharton. Tried below before the Hon. W. H. Burkhart.

John C. Clark, whose estate was the subject-matter of this litigation, died at his home in Wharton county in the year 1862. He left a large estate, consisting of lands, slaves, and personal assets, the aggregate value of which, at the time of his death, approximated half a million of dollars. An administration was had upon his estate, and in 1866, the administrators, considering that the estate had escheated, delivered the effects remaining in their hands to the then Treasurer of the State, whose successor in office was the defendant and appellee in this cause.

This suit was instituted on the 28th of March, 1871, in the District Court of the county of Wharton. The plaintiffs were Bishop Clark and his two married sisters, the latter joined by their husbands, for the purposes of the suit. They claimed to be the children of John C. Clark by Sobrina, a negro woman purchased by him as a slave in the year 1833 or 1834 ; and they alleged a marriage between Clark and Sobrina, and also claimed the benefits of the provision of the Constitution of 1869, quoted in the head-notes.

The defendant excepted to the petition on several grounds,

and pleaded a general denial. He also answered that, under the provisions of the statute of escheats, he was only holding the property for the benefit of such persons as should prove to be entitled to it; that, besides the plaintiffs there were other designated persons, descendants of Sobrina prior to her connection with Clark, who were necessary parties to the suit; that in July, 1871, the District Court of Fort Bend county, in a suit originally brought in Wharton county, had rendered against him a judgment for these same assets, in favor of Joseph B. Wygall and others, as the heirs of the said Clark, which judgment he exhibited, praying that said Wygall and others be made parties.

A petition of intervention by Wygall and his co-claimants was offered, but was disallowed.

At the December term, 1871, D. Owens, L. Owens, and their widowed sister, claiming to be issue of Sobrina previous to her connection with Clark, and therefore to be entitled to shares in her moiety of the community property, came in as parties plaintiff. The children of a deceased daughter of Sobrina were admitted also as plaintiffs, on the same allegations.

According to the evidence, John C. Clark came to the State of Coahuila and Texas at some time prior to the year 1830. He settled within the present limits of Wharton county, and there resided until his death in 1862. When he came to Texas he was a single man. Sometime in 1833 or 1834, he bought the woman Sobrina, and within the four or five succeeding years she became the mother of three children, now plaintiffs in this suit. The evidence makes it reasonably certain that Clark was the father of these children.

Numerous witnesses, on both sides, were examined to prove the character of the connection between Clark and Sobrina. Those introduced by the plaintiffs were nearly all negroes who had belonged to Clark in his lifetime. Several of them testified that Clark and Sobrina habitually occupied the same bed, and ate at the same table; that Sobrina carried the keys and exercised the authority of mistress of the house. Some of them

swore that they had heard Clark speak of her as his " wife,"
and of the plaintiffs as his " children ; " and that he made a
great difference in his treatment of them and of the hands on
his plantations.

A number of white witnesses testified for the defense.
Some of them had known Clark before the Revolution.
Others had been in his employ as overseers.   The testimony
of these witnesses proved the general repute in the neighbor-
hood that plaintiffs were the issue of Clark by Sobrina ; but
none of them had ever heard a pretense that they were hus-
band and wife, nor had any of them ever heard Clark mention
Sobrina as his wife or the plaintiffs as his children.   Some,
who had the best opportunities of knowing, never observed
that Clark treated Sobrina and her children with any percep-
tible consideration.

Clark was a man of little or no education, unsocial tempera-
ment, and apparently engrossed by a desire to accumulate
property.   He appears to have had no intimates of his own
color.   Of his relatives he rarely spoke, and then not in kindly
terms.   Sobrina died in 1869, or thereabouts.

This, of course, is but a general outline of the evidence ad-
duced in the court below ; but there is no occasion for a minute
detail of the particulars.

At the December term, 1871, of the court below, a trial was
had before a jury, who found that the original plaintiffs, Bishop
Clark and his two sisters, " are the legitimate children and law-
" ful heirs of John C. Clark and Sobrina Clark ; that John C.
" Clark and Sobrina were legally married in 1833 or 1834, and
" lived together as husband and wife until the death of John C.
" Clark ; that of the real estate mentioned in plaintiffs' petition,
" his interest in his headright was the separate property of John
" C. Clark, and that the balance of the estate was the common
" property of John C. Clark and Sobrina Clark."   They fur-
ther found that D. Owens and the other intervening plaintiffs
were Sobrina's issue prior to her " marriage " with Clark, and
were lawful heirs of Sobrina.

44

By a bill of exceptions it appears that when the jury returned their verdict into court, they stated that they could not write it out, and the court then asked them as to their finding, and they announced in open court, and the court caused the verdict to be written out and read to the jury, who announced it as their verdict.

Defendant's motion for a new trial was overruled, and judgment was rendered for the plaintiffs according to their respective interests, and defendant appealed. The errors assigned were principally to the instructions given to the jury, which, substantially, are of the same tenor and effect as the rulings in the opinion delivered by this court.

The schedule of notes, mortgages, and other claims in the defendant's hands approximated four hundred thousand dollars in nominal value.

*Wm. Alexander, Attorney-General,* and *Robards & Blackburn,* for the appellant. The question involved in this suit is: Are the appellees the legitimate children of John C. Clark, and as such entitled to the estate now in the custody of the appellant?

I.    And under this arise the questions: Were John C. Clark, a man of European descent, and Sobrina, a woman of African descent, ever legally married ?

II.    Does this case come within the purview of Article 12, Section 27, of the State Constitution.

III.    Are the appellees—Bishop, Lorinda, and Nancy—the issue of such marriage or legitimatized by said section ?

We deny each and every of the above propositions, and will endeavor to fairly discuss each in its proper order.

I.    We think that the court below erred, and wholly misled the jury by its charge of what constituted marriage, its requirements, and the proof necessary to establish the fact of marriage.

It is in proof that John C. Clark came to and settled in this State prior to 1830, and that in 1833 or 1834 he purchased as a slave the woman Sobrina.

By the ninth section of an act approved June 5, 1837, it was declared to be unlawful for any person of European blood, or their descendants, to intermarry with Africans, or the descendants of Africans, and should any person violate said section, such marriage was null and void. (Laws of the Rep., Vol. I., 233, and H. D., Article 2446.) Hence, if this marriage was ever contracted at all, it must have been done prior to June 5, 1837, in order to be valid.

Previous to the passage of this law, the civil law of Spain and Mexico was the fundamental law of the land. (Const. of the Rep. of Texas, Schedule, Section 1; Gortario v. Cantu, 7 Texas, 46.) And it was not until January 20, 1840, that the common law of England was adopted as the rule of decision in civil cases. (P. D. Article 804.) We must therefore look to the civil law, the *lex loci contractus*, for the law governing marriage contracts. According to the civil law, marriage partook of the nature of a civil contract and a sacrament of the Roman Catholic Church—the established religion of this country at that time. (Const. of Coa. and Texas.) And in order that a marriage should be properly and legally consummated, it was necessary that the parties go through and observe certain laws and regulations prescribed before entering into the marriage relation. There must be an espousal or promise to marry, before entering into the marriage relation. " A solem- " nity, testifying the will of the contracting parties, ought to " precede marriage, which we call mutual promise of future " marriage or espousals." (White's New Recopilacion, or Land Laws of California, Oregon, and Texas, Title VI., 43; Johnston, Civil Law of Spain, 45.)

By the civil law marriage was defined thus: "Marriage is " the conjunction of man and woman, made with the intention " to live always together, and not to separate, observing chas- " tity one to the other, and not cohabiting with any woman or " man, living both together." (Id., 43.)

Upon this definition are founded the following principles : " Third. That to render marriage valid, will and consent must

" concur in the pronunciation of the promise."　" Fourth. That
" it be not done clandestinely."　(Id., 43.)　From the fourth
principle are deduced: " 1st. That secret marriages are forbid-
" den, as are also those which are celebrated without witnesses,
" or without giving notice of it in the parish church of which
" the contracting parties are parishioners."　" 2d. Besides the
" ecclesiastical penalties, those who marry clandestinely will be
" also liable to civil ones, and thus not only will their children
" be illegitimate, but thus incur the penalty of confiscation of
" property, banishment, and just cause of being disinherited."
(Id., 45.)　" The marriage is complete as soon as the contract-
" ing parties have presented themselves before their own curate,
" or with his consent, or with that of the bishop, before some
" other priest, and have declared before him their wish to marry,
" and he has declared that they are united in matrimony."
(Civil Law of Spain and Mexico, Schmidt's, B. I., Title I.,
Article 22.)　" It is likewise the essence of the contract that it
" should be celebrated in the presence of at least two witnesses
" possessing the qualifications required of witnesses to other
" authentic acts."　(Id., Article 23.)　" Every marriage must
" be publicly proclaimed by the curate of the parish during
" three consecutive holy-days at high mass."　(Id., Article 24.)
And with regard to the effect of marriage upon the children
begotten by the parties: " They were either legitimate or nat-
" ural.　Legitimate children are those who are born of father
" and mother that are truly married according to the precepts
" of our Holy Church.　Hence, it follows that those are not
" legitimate who are born of persons who marry clandestinely,
" or of those who have married, being aware of an impediment
" to their marrying, although they should marry in the face of
" the Church."　" 4th. That those are not legitimate who are
" born of parents not married according to the precepts or ordi-
" nances of the Church."　" 5th. That neither are the children
" of a concubine legitimate, although the father should marry
" her.　Legitimate children enjoy and inherit the honors of
" their fathers, grandfathers, etc., are able and competent to re-

" ceive dignities, and succeed to their fathers and other rela-
" tions."

" Natural children are those who are not born in wedlock.
" These comprehend bastards, or the illegitimate children who
" are born from adulterous intercourse, the children born of
" prostitutes, the spurious, that is, children born of a concu-
" bine; and such do not enjoy the advantages of legitimate
" children." (White's New Recopilacion, Title VIII., 64;
Johnston's Civil Law of Spain, 72.)

The court, in direct violation of this the *lex loci contractus,*
charged the jury as follows:

" In determining whether or not a marriage existed between
" the said Clark and the said Sobrina, you will take into con-
" sideration the manner in which the parties lived together—
" whether they cohabited together, observing chastity one to
" the other; whether they openly and publicly acknowledged
" and recognized each other as husband and wife, and in their
" general intercourse treated each other as such ; whether So-
" brina's authority at the place of residence and over his prop-
" erty was such as to reasonably flow from the existence of the
" marriage relation ; whether Clark recognized these plaintiffs
" as his children and treated them as such—and all other mat-
" ters and things calculated to establish the true relation of said
" Clark and Sobrina one to the other."

" The open and public acknowledgment and recognition of the
" marriage relation need not be made at all times and under all
" circumstances, if such recognition would endanger the personal
" safety of the parties; but if said Clark and Sobrina acknowl-
" edged the existence of the marriage relation as far as was
" consistent with their personal safety so to do, it is sufficient."

" No formal solemnization of the rites of matrimony be-
" tween the parties was necessary to constitute a valid marriage
" between said dates of September 11, 1827, and November
" 13, 1835. If they acted as hereinbefore stated, showing that
" they regarded themselves in no other light than as husband
" and wife, it is all that was necessary."

The above contrast between the law as it really was and the charge of the court we deem amply sufficient for a reversal of this case. But as the appellees have endeavored to bolster up the charge by authorities which we conceive to be wholly inapplicable, we will, in a hasty review of those mostly relied on, give our reasons why we deem them inapplicable.

In Smith v. Smith, 1 Texas, 621, the court decides that cohabitation and common repute, as establishing a former marriage in the countries governed by the common law, cannot be admitted as evidence in the courts of Texas to annul a subsequent marriage contracted here while Texas was a part of Mexico, and solemnized according to the laws which then governed this country; and that according to the system of Spanish jurisprudence, a putative is converted into a real marriage by the removal of the disability, however that may be effected. We are unable to see any relevancy in this case to the case at bar, unless it be to show that the laws of Spain and Mexico, in regard to marriage contract, governed.

In Yates v. Houston, 3 Texas, 433, the parties presented themselves in Texas as man and wife on coming to the State, and it was not claimed that they contracted marriage in this State. It was in proof that a former wife had long been absent and unheard of, and the court simply decides that it is presumed that a marriage was contracted before the parties came to this State, allowing the presumption in accordance with the common law governing the country from which the parties came.

In Nichols v. Stewart, 15 Texas, 230, the court decides that a bond marriage entered into between the parties in 1834, where the husband died shortly after, before June 5, 1837, was, under the statute (P. D., Article 4664), a valid marriage; and that although a child was born to them before this marriage bond was entered into, yet by the laws of Spain a subsequent valid marriage legitimatized the children. The court also decides in this case (p. 233) that these bonds had no validity; and as there was no law to sanction such contracts, there

was none to enforce them, and it could be violated without any penalty by either party. And these bond marriages are only effective where they come under the statute. (P. D., Articles 4662, 4663, and 4664.)

The next case, Sapp v. Newsom, 27 Texas, 539, upon which the appellees most strongly rely, the facts are, that the parties entered into a marriage bond in 1830, and in 1835 the husband died, leaving defendant (Newsom) as his child. The court decides that all of the conditions of the law not having been complied with, this bond marriage was not legalized by subsequent law. (P. D., Articles 4662 and 4664.) And also that the Mexican law in force at that time regarded marriage, not only as a civil contract, but as a religious rite or sacrament. Regarding marriage as a sacrament, the formalities with which it should be celebrated in Catholic States usually conformed to the decrees and usages of the Church. But, although declaring that the above is the law, and that this marriage did not conform to it, hold that it is the duty of the courts, upon the highest consideration of public policy, to hold that the marriages contracted in those times should be regarded as mere civil contracts, and should be sustained as valid whenever consent of the parties and the intention to enter into the state of matrimony, and to assume its duties and obligations, are clearly shown.

With the highest respect for the court and the learned judge who delivered its opinion, we feel compelled to object to his mere dictum being regarded as authority. It is the duty of the courts, from the highest to the lowest, to decide what the law is, not what it ought to be. And any attempt at legislation by the courts is mere dictum, and carries with it no rule of authority, no matter how learned, or how honorable its membership may be, for they cease to be judges and become men.

We think that a contemplation of the above citations of law and authorities will clearly show that, according to the civil law, no presumption of marriage will be indulged in by the courts, but that the fact of marriage will be required to be

proven by copies from the parish register, or from witnesses who saw the ceremony performed, or some one of the modes required by the civil law showing that the *lex loci contractus* was strictly complied with. And no attempt to prove a clandestine marriage will be allowed for the purpose of establishing the heirship of appellees by the courts, as it will be remembered that one of the effects of a clandestine marriage was to make the children illegitimate. (White's New Recopilacion, Title VIII., 64; Title VI., 45; Johnston's Civil Law of Spain, 72.)

But, supposing that our conclusions are wrongly drawn, and the court will admit the common law rule of presumption of marriage contracted in this State prior to 1835, under certain circumstances, will the court presume a marriage in the case at bar?

We understand that in all cases, where the pedigree of the persons claiming as heirs is sought to be established, the fact of the marriage of the putative ancestors must first be established before such are entitled to rank as heirs. And that general reputation and cohabitation are only evidence of the fact of marriage, and do not of themselves constitute marriage. (Greenleaf on Ev., Vol. II., Sections 461, 464; Phillips on Ev., Vol. I., p. 427; Phillips on Ev., Vol. V., p. 285.)

Hence, if we are able to show, from the circumstances of the case, that the fact of marriage never in reality took place, or that the general reputation was to the effect that the fact of marriage never in truth took place, then the court will not presume a marriage from any amount of cohabitation, or adulterous conduct. What, then, is the proof upon this point? There is not one of the witnesses who testify to the fact of marriage—that the parties themselves ever claimed that they were actually married. But, to the contrary, several of the witnesses testify positively that Clark himself claimed that he was never married. Abraham Kinchloe, plaintiff's witness, testifies : " I never heard Clark, or any body else, say that he had " married Sobrina." Pleasant Ballard, also for plaintiff, and

husband of one of the claimants, says: " Was generally under-
" stood that Sobrina was his (Clark's) wife, but I never heard
"anything about the marriage." James Anderson testifies:
" Clark said, in 1853, that he would not propose to marry any
" woman; that he was at that age when no woman would marry
" him but for his property, and he had lived (so) that he cared
" nothing for marrying, and that he did not intend to marry.
" In 1850, I took the census of this county; Sobrina, Bishop,
" Lorinda, and Nancy were numbered by Clark as his slaves at
" that time, and so returned." Abraham Ross testifies: "He
" (Clark) told me he was a bachelor." B. J. Sandford says:
" Heard Clark, 1854 or 1855, regret he had never mar-
" ried." Edward Collier states: "I knew that he (Clark)
" was a single man. Heard him regret that he had never mar-
" ried. The general report in the neighborhood in those sla-
" very times was, that Clark kept a negro woman, Sobrina, as
" men frequently did in those days. No one ever thought, or
" was it reported, that they were married, or husband and wife."
F. J. Lawson testifies: " Clark told me that he had nobody to
" give his property to, and said he had as soon give it to me
" as any one else."

In addition to these positive acts and words of the deceased
himself, the general reputation, founded upon his uniform
course of conduct among his intimate friends and neighbors,
was that he was a single man, and had never married. His
nearest neighbor, who had lived within two miles of him since
1832 or 1833, had never heard any report that he was married.
He was never heard to speak of his wife, never introduced So-
brina into society as his wife. But, on the contrary, to the
census-taker, his most intimate friends, his lawyer, and all his
neighbors, he represented that the relation existing between
him and Sobrina was that of master and slave. And the only
exception to this rule of conduct that it is contended ever took
place occurred in the presence of those who, as deceased well
knew, were not permitted to testify in the courts of the coun-
try by the laws then in force.

It is also asked that the court will not only presume a marriage between the parties against this array of facts, but also that they will presume that John C. Clark, who, it was proved, could have married any marriageable lady in the neighborhood, forsook those ladies of his own social standing, and married a woman who, at that time, was generally regarded as greatly his inferior; and so much were such marriages condemned that two years later it would have subjected the parties to a criminal prosecution. And even at this day, when it is hoped the world has grown wiser and better, it would seem a violent presumption to suppose that a man of Anglo-American birth and education would marry a woman of African descent, at that time his slave, his chattel. We may stigmatize this aversion of one race for the other unreasonable, without good sense, mere prejudice, yet all must admit that the fact of this aversion really exists in the minds of most all white men to such an extent that the idea of intermarriage of the races is wholly repulsive, even at this day; and how much more must it have been before the African was raised to the dignity of an American citizen.

II. Does this case come within the purview of Article 12, Section 27, of the State Constitution?

We think not, for the following reasons: The language of the section, "both of whom, by the law of bondage, were pre-"cluded from the rights of matrimony," wholly debars the idea that Clark was in any way "precluded from the rights of mat-"rimony." He was in no way subject to the law of bondage; he was a free man. The evident intention of the section is to provide for those persons who were subject to the law of bondage, and were not allowed by the law of bondage to use their own wills in such matter, but were subjected to the will of their master.

This section, however construed, could in no way apply to the case at bar. John C. Clark died in 1862, and the right to his estate vested immediately in his heirs, in accordance with the laws then in force governing descent and distribution.

And no subsequent legislation, by Constitution or otherwise, could possibly divest those heirs of his estate, and create new heirs. Such would be in direct violation of the Constitution of the United States. (Lee *v.* Smith, 18 Texas, 144; Hamilton *v.* Flinn, 21 Texas, 716; Sapp *v.* Newsom, 27 Texas, 539; Dartmouth College *v.* Woodward, 4 Wheat., 629.)

*W. P. Hamblin,* for the appellees.

*A. B. Peticolas,* also for the appellees. Our reports abound in reference to the Partidas as the law in force in Texas, prior to 1836 (Yates *v.* Houston, 3 Texas, 438, 447, 453; Guess *v.* Lubbock, 5 Texas, 535), and Smith *v.* Smith (1 Texas, 627, 628, 629) recognizes it as determining the laws of marriage prior to 1836; and I will now quote from that law to show: first, that a man might, prior to 1836, marry his slave; and second, to show that by marrying, he manumitted her.

In Law 11, Title II., 4th Partida (Moreau and Carlton's Partidas, 461), it is laid down—"that if a free man marry a "female slave, or the latter marry a free man not knowing of "the slavery, such marriage would not be valid, unless the "spouse that is free consent, by word or deed, after he is in- "formed of his error, by ratifying the marriage, or by having "carnal knowledge of the other. But if such marriage had "been entered into, while the party who is free knew be- "fore it was contracted that the other was a slave, then the "marriage will be valid, and cannot be annulled on that ac- "count." Also Law 1, Title V., 4th Partida, Ib., 470, it is said: "Likewise, a slave may marry a free woman, and the "marriage will be valid, if she know at the time she married "him that he was a slave, and so may a female slave marry a free man," and in Law 4, Title V., 4th Partida, Ib., 472, the same doctrine is held; and after marriage, the wife shall enjoy the same condition, state, and dignity, as the husband, although, before marriage, they may have been unequal in

situation. (Law 7, Title II., 4th Partida; 1 White's Recopilacion, 41.)

But in Texas the question has been decided. In Guess v. Lubbock, Lipscomb said—" that by marrying his slave, a man " emancipates her; for such is the Spanish law; " and we gather from that case, that in Texas a man could manumit his slave prior to 1836, by any act clearly showing that intention. (See also Jones v. Laney, 2 Texas, 349; McCutchen v. Marshall, 8 Peters' R., 238; Hope v. Johnson, 2 Yerger's Tenn. R., 123.) Guess v. Lubbock does not decide that a man could not manumit his slave according to the modes laid down by the Spanish law; but simply decides that these modes, recognized by the slave-holding country of Spain, were not the only modes by which it could be effected in Coahuila and Texas, in 1834 and 1835; that this law did not restrict a master desiring to emancipate his slave, and compel him to follow any of the modes of the old law, but that he might emancipate by any act, clearly showing that intention; and it cannot be objected to an act of emancipation by a master, that he freed his slave in a more formal manner than the law required.

Directly connected with the above subject is my third proposition—that between 1827 and 1835 there was no law prohibiting marriage between whites and blacks, or between master and slave. The citations from the Partidas, made under my second proposition, establish this position, and it is shown to be firmly engrafted in the Mexican and Spanish jurisprudence, by Law 6, Title II., 4th Partida. (Moreau and Carlton's Partidas, page 457.) "Except those who are expressly pro-" hibited by law from marrying, all other persons may contract " marriage, who are of sound understanding, so as to be able " to consent to marry, and who labor under no impediment " which prevents them from having commerce with woman."

The exceptions laid down are: First. Minors, not of consenting age. Second. Slavery, under the exceptions laid down (where the free person marrying knows the other to be a slave). Third. Religious vows. Fourth. Relationship. Fifth. Incest.

Sixth. Sins. Seventh. Duress to compel marriage. Eighth. Religious orders. Ninth. The law which ought to be observed through deference to the church and the people. Tenth. Affinity. Eleventh. Impotence. Twelfth. Madness. Thirteenth. Minority. Fourteenth. Marriage during holy-days. (Laws 7, 10, 11, 12, 13, 14, 15, 16, 17 and 18, Title II., 4th Partida; Laws Spain and Mexico, 8 and 9.)

Upon examination of the facts, we find that Clark and Sobrina did not come under any of these exceptions except the ninth, the performance of the ceremonies prescribed by the Catholic church; but we will find hereafter, in the examination into the question of the quantity of evidence necessary to establish a marriage, that our courts have uniformly held marriage, in those times, not to be a sacrament, but a mere civil contract, to establish which no proof was necessary as to its actual celebration. (Sapp v. Newsom, 27 Texas, 540.) It was not until January 16, 1837, that, by legislative enactment, whites and blacks were prohibited from marrying (P. D., 4670), and the common law was that neither "race, order, nor social rank " appears to constitute an impediment to marriage at the com- " mon law." (Schouller's Domestic Relations, 28; Bishop on Marriage and Divorce, 308, 371.)

My fourth proposition is, that Sobrina, once being free, no subsequent legislation could re-enslave her, and the children born after her freedom, follow the status of the mother. This results without regard to how Sobrina obtained her freedom, whether by reason of her becoming domiciled in Coahuila and Texas, or by her marriage. Once free she was always free, and her after-born children also. And even " if a slave, with the knowl- " edge of his owner, has gone at large and acted as free, for any " considerable length of time, a jury may be directed to pre- " sume that a deed of manumission was executed, with all " required formalities." (Parsons' Contracts, 402; see also cases cited as authority on first proposition.) "No presumption " of slavery arises against a party asserting his freedom, from " the length of time, however great, that he and his ancestors

" have been held in slavery. If a person held as a slave can
" show that his ancestors, in the female line, no matter how
" many degrees removed, was, *de jure*, a free woman, he may
" vindicate at law his own right to freedom." (1 Pars. Cont.,
402.) " If a slave enjoys his freedom ten years while his master
" was in the country, * * * he cannot thereafter be
" claimed as a slave, neither by his master nor any one for him."
(Law 23, Title XXVIII., 3d Partida; Moreau and Carlton's Par-
tidas, 386.) " If a man be free, no matter how long he may be held
" by another as a slave, his state or condition cannot thereby be
" changed; nor can he be reduced to slavery, in any manner
" whatever, on account of the time he may have been held in
" servitude." (Law 49, Title XXIII., 3d Partida, Ib., 387.)

But it may be contended that the ninth section of the Gener-
al Provisions of the Constitution of the Republic of Texas had
the effect to re-enslave Sobrina. To this I reply by referring
the court to the construction of that section by our own
Supreme Court, in Guess *v.* Lubbock, 5 Texas, 547 and 548,
by which it clearly appears that only those who were then held
in bondage were affected by that legislation, even according to
its most liberal construction. And if the fact was, as the proof
shows it to have been in this case, that Sobrina was not held by
Clark in bondage from 1833 to 1836, but that she was regarded
as a wife, and had her perfect freedom as a wife, then that sec-
tion has no force and effect as to her, and never had.

If the mother was free, all after-born children are also free.
(Justinian's Institutes, by Cooper, 13; Harris *v.* Clarissa, 6 Yer-
ger's Tenn. Rep., 227; Scott *v.* Williams, 1 Deverau's N. Caro-
lina Rep., 367; Pegram *v.* Isabell, 2 H. and Mumf. Va. Rep.,
193; 1 Parsons' Contracts, 402.) And the children are free,
even though the mother has a term of years to serve before her
freedom. (1 Cox, N. Jersey Rep., 36; Isaac *v.* West, 6 Rand.
Va. R., 652; Hart *v.* Fanny Ann, 6 Monroe's Kentucky R.,
49.)

I now reach my fifth and last proposition, that the charge of
the court defining marriage, and the amount and character of

the evidence necessary to prove it, is a correct exposition of the law.

The definition of marriage given by the court was the civil law definition (1 White's Recopilacion, 43; Law 1, Title II., 4th Partida), which was the received definition prior to 1836; but in his charge the court did not confine himself to that definition; but required the jury to find facts which would prove marriage at common law, the definition at common law being, in fact, not materially different from that by the civil law. Bacon defines it to be a compact between a man and a woman, for the procreation and education of children (6 Bacon Ab. 454); children being the chief end of marriage, in his catechism. Schouler's Domestic Relations, 22, contains, perhaps, one of the best common law definitions.

The common law and the civil law both make consent, or the will to marry, the essence of the contract. (2 Kent's Com. 87; 2 Bouvier's Law Dicty., 109, 110; Bishop on Marriage and Divorce, 218, 269; Schouler's Domestic Relations, 40; Frasier's Domestic Relations, 145, 149; Swinburn's Spousals 2d ed., 87.) " Consent alone, joined with the will to marry, constitutes mar-" riage between man and woman." (Law 5, Title II., 4th Partida.) The essential elements of marriage are the same at common law and in the civil law, and the causes which hinder or prevent marriage are almost identical. (Schouler's D. R., 27 to 37.)

Authorities might be multiplied on this point largely; but as this was a marriage prior to 1836, in the territory which is now Texas, and as our own Supreme Courts have had several cases before them, in which the very question here discussed, viz.: the amount of proof necessary to establish a valid marriage, in those times, was directly in issue, of course those cases are directly binding on this court until overruled, and are the authorities that require the clearest and most searching examination; and as I consider them decisive of this question, to them I will now address myself:

Smith v. Smith, 1 Texas, is the first case, and it decides that a marriage contracted in good faith, though null because the

husband had a wife living, nevertheless produces all the effects of a true marriage, in favor of the second wife and offspring; and that the second wife was entitled to the administration, and the second wife and offspring to the property.

Yates v. Houston, 2 Texas, 433, decides, that where parties presented themselves in Texas, in 1822, as man and wife, were registered as such, and were reputed to be such by their neighbors, and lived together until the death of the man, in 1827, that it must be presumed that they actually entered into the marital relation, notwithstanding the facts in proof, that the man had a wife living, and that the woman who came to Texas with him, was, in fact, his mistress, and ran off with him from his old home; and notwithstanding a total failure, upon the trial, to show any evidence that any marriage had actually been contracted between them, under the most liberal common law rules. Upon this state of facts, she and her children are held entitled to the property, and the court intimates that it would make no difference, even admitting that she was his concubine, and the court decides what amount of evidence will establish a marriage, in this class of cases. In the case at the bar, under the last clause of the court's instructions, the verdict of the jury conclusively negatives the idea that Sobrina was Clark's concubine; that issue having been submitted to them.

In Nichols v. Stewart, 15 Texas, 227, the woman had married a man by bond, in 1832, and they lived together a few months. She subsequently abandoned that marriage and took another man for a husband, with whom she was living at the birth of her first child. In 1834, when that child was about twelve or eighteen months old, a marriage bond was executed between the second man and the woman. It was held by the court, that at the time these bonds were entered into, " there was no " means of celebrating matrimony in any form recognized by " the law of the land,    *    *    *    and parties were driven " back to the primitive elements constituting the married state, " and this, no doubt, was the mutual consent of the parties; " that the first bond had no validity, and could be violated with-

out penalty to either party, and that because the woman and her second man lived together as man and wife, when the child Rachel was born, and up to the death of the man, which happened a short time after the date of the bond, therefore the marriage was valid, and Rachel legitimate. It is true, that in this case, mention is made of the statute validating bond marriages, but in Sapp *v.* Newsom, next to be reviewed, it is decided that that statute was not necessary to the validity of such unions.

The next and last case is Sapp *v.* Newsom (27 Texas Rep., 537), which was another bond marriage case, and is one of the strongest authorities upon the question of the validity of the marriage of Sobrina and Clark, in 1834.

In this case, the court says : " The condition of Texas, in the " year 1830, being such as to render it impossible for the in- " habitants to celebrate the rites of matrimony, in accordance " with the forms prescribed by the decrees of the church, with- " out going beyond the limits of the province, and subjecting " themselves to great dangers, in traveling to one or two dis- " tant points, where ministers of the established religion could " be found, we think it the duty of the courts, upon the highest " considerations of public policy, to hold that the marriages " contracted in those times should be regarded as mere civil " contracts, and should be sustained as valid whenever the con- " sent of the parties and the intention to enter into the state of " matrimony and to assume its duties and obligations is clearly " shown." In this case, Sapp *v.* Newsom, a child of the bond marriage was decided to be legitimate, although the man and the woman did not continue their relationship until it was severed by death.

I think the true ultimate of law, of justice, and of equity, will be reached in this case by a final adjudication, affirming the judgment of the court below ; and nothing less than a judgment of this court, the court of last resort in our State, and the court which fixes the authoritative rules of Texas law, would convince me that the great State of Texas would condescend to become a mere wrecker.

45

The wrecker stands on the stormy coast, he sees the ship go down ; he seizes the rich merchandise floated in by the winds and waves to his feet ; he eagerly grasps and avariciously retains his treasure trove, and never restores it to its true owner, even though he be the son of the owner of the ship and treasure, come to reclaim it. But the State of Texas, with regard to all escheated estates, stands in a very different attitude. She is the self-appointed guardian *ad litem* for unknown heirs ; keeps such estates for them, and freely and willingly gives it to them whenever they are, in truth and in fact, discovered.

WALKER, J.—The verdict of the jury in this case reads as follows : " We, the jury, find the plaintiffs are the true heirs of " John C. Clark."

This verdict was found upon evidence going to prove that John C. Clark and the mulatto woman Sobrina, who is the mother of the appellees, were in Texas long before her independence of Mexico. Sobrina was here as early as 1828 or 1830. The institution of slavery, after the 11th of October, 1827, could not exist by law, until after Texas established her independence and declared herself a slave state.

The right of the appellees to inherit the estate of John C. Clark is disputed on the ground of their illegitimacy. It is claimed that their mother was a slave, and never could by law become the wife of John C. Clark, and that the maxim *partus sequitur ventrem* applies to the children of Sobrina.

The counsel for appellant have learnedly discussed the law of matrimony, as it existed in Texas prior to independence, and now exists in Mexico. There is no doubt but in all countries where the Roman Catholic Church is established by law, and to a greater or less extent controls civil government, marriage is regarded as a sacrament, rather than as a civil contract ; and the manner of solemnizing marriage in that church is peculiar and formal, although, by the Roman law, marriage was a civil contract.

But the argument of the learned counsel falls far short of

being conclusive, for there was no law of Mexico controlling the people of Texas from 1828 to 1837, which prevented the intermarriage of different races. On the contrary, it is a well-known fact that such marriages are common to the people of that country, of every degree of social standing.

But we are unable to see why the same facts which would authorize a jury to presume a marriage at common law, would not authorize the presumption of a marriage at the altar or *in ecclesium.* The maxim *maritagium debet esse liberum*, prevailing in Mexico and throughout her States and provinces at the time when Clark and Sobrina came to the country, and it being customary for the people to mingle the blood of different races in marriage, we see no reason whatever to preclude the presumption of a marriage *in ecclesium*, such as counsel insists must have taken place, if at all.

The evidence from which marriage may be presumed is stated by elementary authors with great unanimity, and cases are cited to show that courts have acted upon the principles as laid down. Kent says, Vol. II., page 53, " Consent of the par-" ties may be declared before a magistrate, or simply before " witnesses, or subsequently confessed or acknowledged ; or " the marriage may be inferred from continual cohabitation " and reputation as husband and wife." Greenleaf, Vol. II., Section 462, lays down the rule that marriage may be proved in civil cases, " by reputation, declarations, and conduct of the " parties," and other peculiar accompanying circumstances ; that marriage may be proved by cohabitation as man and wife. Phillips, Vol. I., p. 444, and Starkie, Vol. II., p. 939, lay down substantially the same rule. The courts have followed out this doctrine. (Hammick *v.* Bronson, 5 Day, 290 ; Fenton *v.* Read, 4 Johnson, 52 ; Jackson, ex demise of Von Buskirk *v.* Claws, 18 Johnson, 346 ; Dee *v.* Fleming, 4 Bingham, 256 ; Wright *v.* Wright, 6 Texas, 19 ; Tarpley *v.* Poage's Administrators, 2 Texas, 149 ; Bonds *v.* Foster, decided at last term ; 12 N. H., 184 ; 19 N. H., 265 ; 6 La., 470 ; 26 Barb., N. Y., 178 ; 2 La. Ann., 944 ; 14 ib., 770 ; 14 Gray, Mass., 411.) These are

only a few of the many authorities which might be referred to in support of the rule thus laid down.

But this case requires the construction by this court of the twenty-seventh Section of the twelfth Article of the Constitution of 1869, which reads as follows: " All persons who, at " any time heretofore, lived together as husband and wife, and " both of whom, by the law of bondage, were precluded " from the rights of matrimony, and continued to live together " until the death of one of the parties, shall be considered as " having been legally married, and the issue of such cohabita-" tion shall be deemed legitimate. And all such persons as " may now be living together in such relation, shall be con-" sidered as having been legally married, and the children here-" tofore or hereafter born of such cohabitations shall be deemed " legitimate." Prior to the emancipation of the slaves, marriage with that class was not, in a legal sense, authorized; yet there was that sort of contubernism among them which resulted in procreation of families. There was a certain degree of continence, and, to some extent at least, a moral observance of the matrimonial condition. This, but for the law of bondage, would have been regarded, in every sense, as legal marriage. The laws of slavery did not forbid the coupling together of man and woman in this manner, but none of the marital rights belonging to free and civilized society accompanied this cohabitation and sexual commerce.

Furthermore, the law forbid persons of the Caucasian race from marrying those of African descent. Free persons of color were not allowed to inhabit the State as citizens, except under special legal authorization. Whether, then, Sobrina, the mother of the appellees, was a slave or free woman, it mattered not; she could not legally have married Clark nor any other man, and Clark, being a white man, could not have married Sobrina after the year 1837.

It may be well here to notice that if the parties were married prior to 1837, no law subsequently passed could have divorced them or dissolved the marriage without the consent of

at least one of the parties.    But to return to the constitutional question.    The section under consideration was intended to legalize the marriage of certain persons, and legitimate their offspring; and the inquiry arises, who are such persons and such offspring?    We answer, the persons are those who live together as husband and wife, and who, by law, were precluded the rights of matrimony.    The law and the evidence show that John C. Clark and Sobrina were precisely such persons.    Their marriage, then, is pronounced by the organic law of the State; and who are the children to be legitimated, if not the children of such persons as are born under precisely the same circumstances in which Clark and Sobrina were placed?    The evidence shows that the appellees are the children of Clark and Sobrina, and the law says, being such, they shall be deemed legitimate; and the sequence of their legitimacy is the right to inherit the property of their father.

But, in the learned argument of the Attorney-General for the State, it is assumed, from the fact that John C. Clark died in 1863, and that the present Constitution was not adopted by the people of Texas until 1869, the property of John C. Clark could not lie in abeyance, but there must have been a descent cast upon other heirs, or the property escheated to the State. The proper measures have never been taken to escheat this property, unless it be in this proceeding, in which the State has not yet achieved success.    These children of Clark had a right to come in and contest with the State for the property.    (See Article 3658 *et seq.*, Paschal's Digest.)    But suppose the property had been escheated, or had vested in the State, we believe the people of the State, in the formation of their Constitution, had a right to provide for such cases in the manner they have done in Section 27, Article 12, of the Constitution.

We believe the proper parties are before the court in this case; that the verdict of the jury has established all the necessary facts to support the judgment, and it is therefore affirmed.

Affirmed.